J. SHERIDAN McCLEES *v.* BEULAH P. McCLEES.

BEULAH P. McCLEES *v.* J. SHERIDAN McCLEES.
[Nos. 85, 86, October Term, 1931.]

*Decided January 22nd, 1932.*

The causes were argued before BOND, C. J., URNER, AD-KINS, OFFUTT, PARKE, and SLOAN, JJ.

*Frank Driscoll* and *William H. Lawrence,* for J. Sheridan McClees.

*James Fluegel,* with whom was *Harry C. Kalben* on the brief, for Beulah P. McClees.

PARKE, J., delivered the opinion of the Court.

Beulah P. McClees was married to J. Sheridan McClees on August 1st, 1928, and they have no issue of their union. The husband was a widower, with three children, and the wife had been twice married and divorced, and had received from her second husband a settlement of about $11,000 by way of alimony. Her last matrimonial adventure was unhappy, and the wife left the husband on August 23rd, 1929, and, on September 6th, 1929, filed a bill for a divorce *a mensa et thoro,* alimony *pendente lite,* and permanent alimony and counsel fees. The grounds alleged were the constructive desertion of the husband, and his cruelty, which compelled her to leave home to obtain safety and preserve her health. The chancellor denied her relief, and this action was affirmed on appeal by this court. (See *McClees v. McClees,* 160 Md. 115, 152 A. 901.) The opinion was written by Judge Digges, who, after a thorough and careful review of the testimony, stated the conclusion of this tribunal with respect to the character and conduct of the wife as follows:

"The record is replete with evidence as to the violent temper of the wife, and profane and abusive language directed to her husband, her mother-in-law, and the children. It is needless to record these expressions, but there can be no reasonable doubt as to their having been used by the wife, because they are testified to by numerous witnesses on numerous occasions, and are only half-heartedly denied by her. The wife says she still loves her husband, and wants to live with him, provided he establish a home wherein they can live by themselves, which is equivalent to refusing to return to his present home.

"The chancellor, with the most satisfactory opportunity, has determined that there has been no constructive desertion

on the part of the husband, and no cruelty established such as the law recognizes as a cause for divorce *a mensa et thoro.* After a careful consideration of the record, we are in agreement with that conclusion. We find that the presence of the children and mother-in-law in the home, they being dependent upon the husband, does not constitute constructive desertion by the husband and does not justify the wife in leaving. As to the acts of alleged physical cruelty relied upon, it is sufficient to say that, in our opinion, they were brought on by the words and acts of the appellant, and that what force was applied to the person of the wife by the husband was to reasonably protect himself from her aggressions, there being apparently little difference in their physical strength. There is no evidence whatever of the wife being in physical fear of her husband. On the contrary, the whole record discloses an attitude on her part of belittlement and contempt for her husband."

The decree of the chancellor was dated June 18th, 1930, the appeal was argued at the following October term of this tribunal, and the cause was decided here on January 13th, 1931. Four months later, or May 14th, 1931, the wife began a second suit for alimony *pendente lite,* permanent alimony, and for an injunction to restrain the husband from disposing of any interest he may have in the properties enumerated in her bill of complaint.

The theory of this second bill of complaint is that the wife is entitled to temporary and permanent alimony, because, after the affirmance of the chancellor's decree by the appellate court, the wife has sought a reconciliation, and has endeavored to resume marital relations and has promised to be a good wife, but has been repulsed by the husband, who declines to become reconciled with his wife or to contribute to her support. For the purpose of showing his faculties, the new bill alleges that the defendant is a dentist with an income of not less than $12,000 a year from his practice, properties, and the estate of a dead wife, and the owner in fee of several properties worth $40,000.

The husband filed an answer on May 29th, 1931, wherein he set up a lesser income, and specifically stated "that the complainant has never returned to his present home (wherein reside his children and his mother) and he avers that she has never offered so to do. He avers that his home is now and always has been open to receive her, but that she refused and still refuses to live in his home, and her apparent efforts at reconciliation are merely ingenious attempts on her part to embarrass and harrass him, and to thereby improperly obtain from him additional money." The answer to this pleading was a petition filed on June 1st, 1931, in which there is a repetition of her former allegations; an averment that on June 1st, 1931, in response to the defendant's answer, the wife presented herself at the defendant's home to resume her marital relations, and was rebuffed, and a prayer for the allowance of fifty dollars a week as alimony *pendente lite*. The defendant filed on June 3rd a petition for the taking of testimony, which was begun before the chancellor on June 16th, 1931, and resulted in a decree on June 18th, 1931, dismissing the plaintiff's bill of complaint. The plaintiff appealed, and an order was passed on August 12th, 1931, requiring *inter alia* the defendant to pay $200 to his wife's solicitor as counsel fee for prosecuting the plaintiff's appeal, and the defendant entered an appeal from the order for this allowance.

Since the wife left the husband without the commission by him of some distinct matrimonial offense upon which a decree of judicial separation could have been granted, her desertion began when she left, and was not intercepted by the divorce proceedings which she later unsuccessfully began. 1 *Bishop on Marriage and Divorce,* secs. 1757, 1758; *McClees v. McClees,* 160 Md. 129-130, 152 A. 901.

The general rule is that, if one spouse leaves the other without cause, and repents and proposes to renew the cohabitation, and that other refuses, it constitutes desertion by the one refusing, from the time of the refusal, provided the offer to return is made in good faith, and is free from improper qualifications and conditions, and is really intended to be

carried out in accordance with the performance of the duties and obligations of the matrimonial cohabitation. 1 *Bishop on Marriage and Divorce,* secs. 1705-1709, 1764, 1774, 1775; *Simmont v. Simmont,* 160 Md. 422, 432, 153 A. 665; *Wise v. Wise,* 159 Md. 596, 598-600, 152 A. 230; *Epley v. Epley,* 83 N. J. Eq. 214, 89 A. 1028; *Bohanan v. Bohanan,* 150 Iowa, 182, 129 N. W. 819.

There is no dispute that the wife offered to return and resume cohabitation, and she affirms, but he denies, that the offer was in good faith, without any qualifications and conditions, and intended to be fulfilled in a proper spirit. The issue therefore is of fact, and except in respect to the episode of June 1st, 1931, which was after the filing of the pending suit, the husband and wife are the only witnesses produced to testify to what occurred.

1. The conflict between husband and wife in respect to whether or not there were any qualifications and conditions to the wife's offer may first be considered. The wife testified that she had unconditionally surrendered, and that her offer to return was absolute. The husband's testimony is to the effect that his wife never did offer to return to his home until after the pending suit was brought; but that she had requested him to provide her with a separate apartment, where he could stop on his way to the office, and either remain at night or go home to his family. After he declined to accede to these conditions, she, subsequently to suit brought, did ask him to take her back in his household, and presented herself at his door for admission on June 1st, 1931.

This episode occurred under these circumstances. The bill of complaint was answered on May 29th, 1931, by the defendant, who among other matters, stated that his wife "has never returned to his present home (wherein reside his children and his mother) and he avers that she has never offered so to do. He avers that his home is now and always has been open to receive her, but that she refused and still refuses to live in his home, and her apparent efforts at reconciliation are merely ingenious efforts on her part to embarrass and harass him, and to thereby improperly obtain from him

additional money." The wife's attorney gave her a copy of this answer, and called the husband on the telephone and asked him if he would allow his wife to come home, and the husband referred the wife's attorney to his attorneys of record. The wife testified that her attorney advised her to go to her husband's home, although she had endeavored to obtain his consent by telephone, and he had refused to discuss the matter with her. About seven o'clock in the evening, the wife took a hat box, with a few necessary articles, requested her niece and a boarder where she lived to accompany her, and drove in the boarder's automobile to the husband's residence, and ascended the steps of his home. The husband was at the window, and, by his direction, his son barred the door, and the wife descended the steps, entered the waiting automobile, and returned home with her escort. She then called the husband twice by telephone, and he would not talk to her, and late in the evening she wrote a letter in which she made a record of the circumstances and expressed her amazement that she was denied entrance to his home, and then copied the letter and placed it in an envelope, which she had the boarder address and mail to her husband.

The insincerity of this theatrical gesture is evident when it is recalled that her attorney, after inquiring if she could return, had been directed by the husband to confer with his attorneys; that her husband had declined to talk to her on the subject; and that, before the party set out to come back again, her niece had been told by her, "Ruth, he hasn't said I can come back. Do you want to go with me?" Independently of whether or not the husband desired a reconciliation, this act of the wife was while her suit was pending, and is so manifestly a self-serving maneuver made *post litem motam* that it has no evidential value in determining the question whether or not the wife's offer to return before suit brought was a conditional one, as maintained by the husband (*Schwab v. Schwab,* 93 Md. 387, 49 A. 331) and leaves the fact of the existence of the condition to depend upon whether the husband or the wife is believed, with the burden of proof on the wife.

2.   The fact that the husband had ceased to love his wife, and that her society and companionship had become repugnant, would not justify him in refusing to resume cohabitation with her, if her offer were made with the purpose of loyally fulfilling all the duties and obligations of that state. *Short v. Short,* 151 Md. 444, 447, 135 A. 176. If, however, her offer, when made, lacked this quality, a deserting spouse could not thereby end her desertion and obtain alimony of her husband.   1 *Bishop on Marriage and Divorce,* sec. 1688.

Consequently, there is, in the second place, a further problem of ascertaining if the wife's offer to resume cohabitation was made in good faith and with the purpose of being fulfilled in the proper spirit.   The wife now declares that her offer of return and reconciliation was made honestly and because of her love for her husband.   The method of determining her actual intent and mental state is to take her words and acts, and see if they are consistent or inconsistent with her declarations.   In her former suit for divorce *a mensa et thoro* and alimony, she charged under oath her husband with having treated her with great cruelty and brutality, and having been guilty of excessively vicious conduct, threatening her life, striking her, and beating her to such an extent that she was in fear of her life, so that her health had been greatly injured and impaired, and, having regard for health and her safety, it was impossible for her to live any longer with him.   She testified to these conditions, and, further, that her husband's insistence upon his aged mother living at his home had made the situation unendurable.   The chancellor who heard that cause, and this tribunal on appeal, adjudged that these averments were untrue, and dismissed her bill of complaint.   In the present litigation, she repudiates her original accusations, and testified that, while the matter was in course of litigation, and, in the interval before the institution of the instant suit, she had endeavored to have her husband take her back in his home with his three children and the now unobjectionable mother. Yet, only a week before she filed her present bill for alimony, she admitted, on cross-examination, that she had asked her

husband if he had any objection to her filing a bill for absolute divorce in another jurisdiction. On his reply that he would resist any such proceedings in Reno or elsewhere, she testified that she said, "Sheridan, the idea is this, you won't live with me, you won't support me, and you will fight me in any divorce I choose to file."

Notwithstanding the dismissal of her first bill of complaint by the chancellor had been affirmed on appeal, she repeated four months later, in the bill of complaint at bar, the accusation, which had been adjudged false, that her husband "so badly beat and bruised this plaintiff, on the 20th of August, 1928, and was so brutal to her that he drove her, by his bad conduct, away from him, and thereby abandoned and deserted her." Moreover, although the plaintiff knew at the time of her marriage that the defendant's three minor children by a former wife and his dependent mother would be necessary members of the household, the plaintiff, after the marriage, conceived an inveterate dislike for the defendant's mother and his sister, and, because of the presence of the mother and the visits of the sister, and the influence these circumstances had over the defendant, the plaintiff demanded of her husband another home, and justified her leaving her husband because of the intolerable domestic situation which she asserted resulted from the residence of the mother in the home and the visits of the sister. Notwithstanding the conditions at the defendant's home remain the same, yet, without any convincing explanation or reason, the plaintiff has testified that the situation at the defendant's house has so abated that she desires to resume the family life, although the husband testified that it was not until after she brought this suit that she withdrew her condition of return, that he would have to provide her with a separate apartment.

Her change of front is coincident with her loss of alimony. It is accompanied by a season of careful preparation. After her defeat in this court, and although her husband had coldly informed her that he did not love her, and that he would neither live with her nor support her, and that he eventually expected to obtain a divorce from her, she called and im-

portuned him by telephone three or four times every week during the course of four months, and was uniformly repulsed and rebuffed, and she, also, wrote him two appeals by letters, which she laboriously copied by pen and preserved the copies for her lawyer against the day of her need. This methodical persistence in numerous and irritating demands, which the wife knew would be futile, because she knew in advance they would be rejected, reveals her ultimate motive. The real object was not to obtain a restoration of her conjugal rights and situation, but to secure maintenance. It is true she protests her constant love for the defendant and her craving for his society, and she protests her desire for a fresh admission to the home where she affirms she suffered such cruelty, indignity, and vicious conduct that she had to flee for safety of body and to regain her health; and she protests her indifference to alimony, so that, by all cautionary teachings of experience, the lady doth protest too much, and the touchstone of her insincerity is found in these questions and the answers she gave: "Q. You want alimony, don't you? A. Well, I think I am asking for permanent alimony. Q. You are asking for permanent alimony alone and not for a divorce? A. I have nothing to get a divorce on."

There can be no alimony unless the wife can establish a sufficient cause for a divorce, and the burden of proof was upon the wife to establish that she was entitled to a divorce on the ground of a desertion by her husband subsequent to the dismissal of her first bill of complaint, but prior to the filing of her pending bill, because the effect of that decree was to find her guilty of desertion from the time she left her husband's home on August 23rd, 1930. *McClees v. McClees,* 160 Md. 129, 152 A. 901; *Schwartz v. Schwartz,* 158 Md. 80, 148 A. 259; *Heinmuller v. Heinmuller,* 133 Md. 491, 494-495, 105 A. 745; *Polley v. Polley,* 128 Md. 60, 62, 97 A. 526.

The only witness to support her material allegations is herself. Her testimony is neither clear, convincing, nor marked by the accent of truth, and is, with reference to many crucial points, inherently improbable. Furthermore, deed and dec-

laration are at variance, and she is contradicted in essential matters by her husband. A careful weighing of the testimony has produced the conviction that the offer, before the beginning of the cause at bar, of the wife to return was, under the circumstances, improperly conditioned on procuring and maintaining a separate home for her apart from his mother and children (*McClees v. McClees, supra*) ;.and that the request to return was not made in good faith and in the proper spirit, but in pursuance of a plan to obtain a basis for her contemplated suit for temporary and permanent alimony. *Supra; Schwartz v. Schwartz,* 158 Md. 80, 83, 90, 148 A. 259; *Downs v. Downs,* 154 Md. 430, 434, 140 A. 831.

After destroying the peace and happiness of the household, the plaintiff abandoned the husband's domicile without cause, subjected him to a costly defense of her unsuccessful suit for a divorce *a mensa et thoro* and permanent alimony, and, after the dismissal of her bill for divorce had been affirmed, immediately began her requests by telephone and letters for a renewal of cohabitation. The husband testified that he did not believe her sincere, and that he declined to restore relations which she had broken off without justification. She did not enlist in her aid the healing passage of time, but kept the wound open by starting her bill for alimony four months after her final defeat in her first attempt. The husband could not credit her protestations when accompanied by the inquiry whether he would object to her securing a divorce in another jurisdiction. Unless she gave him a better assurance of her .affections, or at least, of her good faith and future fidelity to the matrimonial bond, he, deserted himself, would not, in turn, become a deserter upon his declining to restore to cohabitation the wife who had destroyed his peace and impaired his fortune, and who, in accurate manifestation of her refractory mood, repeated in her second bill of complaint the unfounded accusations of the first. *McClees v. McClees,* 160 Md. 115, 129, 130, 152 A. 901.

The suitor at equity must come before the chancellor with clean hands. The application of this principle is exemplified in *Childs v. Childs,* 49 Md. 509, 513, where, under circum-

stances analogous to those on this record, the court said: "If the alleged abandonment is the necessary result of the conduct of the party seeking the divorce, he or she must first reform and change his or her conduct," and this change must, of course, be established by competent and credible evidence before a divorce will be granted. *McKane v. McKane,* 152 Md. 515, 520, 137 A. 288; *Wise v. Wise,* 159 Md. 596, 598-600, 152 A. 230; *Gellar v. Gellar,* 159 Md. 236, 242, 150 A. 717; *Simmont v. Simmont,* 160 Md. 422, 432, 153 A. 665.

The conclusions of this court on the issues of fact are those of the chancellor before whom the parties and the witnesses gave their testimony in open court, and his decree dismissing the plaintiff's bill of complaint will be affirmed.

3. The solicitor for the plaintiff was allowed a fee for his services on this appeal, and no sufficient ground has been assigned for its disallowance or reduction, and the order will be affirmed.

*Decree in No. 86 and order in No. 85 affirmed, with costs in both appeals to be paid by J. Sheridan McClees.*

URNER, J., concurs in the result.