## TILGHMAN G. PITTS, JR. *v.* MAI NORRIS PITTS
[Nos. 21, 22 and 23, October Term, 1942.]

*Decided December 7, 1942.*

The cause was argued before SLOAN, JOHNSON, DELA-PLAINE, COLLINS, and MARBURY, JJ.

*H. Courtenay Jenifer* and *F. Neal Parke* for the appellant in all three cases.

*Hillary W. Gans* for the appellee in all three cases.

COLLINS, J., delivered the opinion of the Court.

These are appeals, docketed as three cases, from two orders passed 'March 10, 1942, and a decree passed March 23, 1942, by the Circuit Court for Baltimore County. The decree granted a divorce *a mensa et thoro* to Mai Norris Pitts, appellee, from her husband, Tilghman G. Pitts, Jr., appellant, provided that the appellant pay the appellee $50 per month for the infant child of the parties, Mai Garesche Pitts, and awarded the custody of that infant child to the appellee and allowed the appellant to visit this child at stated intervals, jurisdiction of the court over the infant was continued, and

the husband was ordered to pay the costs. The three cases were considered together here.

The appellant and the appellee were married on February 1, 1936. At the time of this appeal, he was twenty-eight years of age, and she twenty-seven. At the time of the marriage and at the time of this appeal, he was employed by a banking institution in Baltimore at a very moderate salary. The wife apparently, from the record before her marriage, was in excellent health and took a prominent part in athletics in school. After the marriage, they went to live with his father and mother, Mr. and Mrs. Tilghman G. Pitts, Sr., at their beautiful home in Dulaney Valley near Baltimore, where they stayed for a few months. They then moved to various apartments in Baltimore, returning during part of the time to the home of his father and mother.

From 1937 until the beginning of this litigation, the appellee, Mrs. Pitts, underwent three operations and previous to the birth of their daughter in March of 1940, had grippe and pyelitis and was in the hospital for about four months. Two or three weeks after the birth of the child, the baby and its mother returned to the Pitts home in Dulaney Valley, where the wife continued in bad health. In June of 1940 the father, mother and baby removed to a home in Lutherville and on account of unsatisfactory servants and the health of the mother, after two days there, they all returned to the home of the appellant's father and mother, where the child and the appellant remained until September 1st. In August of that year, for the benefit of her health, and with the approval of her physician and her husband, the appellee went to York Harbor, Maine, with her grandmother. During that time her husband corresponded with her frequently and it is significant that he did not keep copies of the letters which he wrote to her. She corresponded with her husband, not keeping copies of her letters, and shortly before her return, she wrote him stating that her health was still very much impaired and suggested the suspension of marriage relations until her health im-

proved.  On September 1, 1940, she returned to Balti-
more, was met at the station by her husband, and after
having dinner together, they returned to the home at
Lutherville.  The wish expressed by the wife in her let-
ter was not regarded.  The appellant and the appellee
again set up their home in Lutherville, the child having
been brought from the home of its paternal grandparents.
On the morning of September 4th, the servant not ap-
pearing for work, the wife became very nervous and up-
set.  Later in the morning and after her husband had
gone to his work, she returned the child to the home of
its paternal grandparents, and she went to the home of
her mother, Mrs. Griffith.  Her mother, who had strenu-
ously opposed the marriage, called the appellant on the
telephone and informed him that her daughter had come
to her senses and had left him to come to her home,
and she was going to send out for the clothes and the
baby.  Mrs. Griffith, at that time, refused to allow ap-
pellant to speak to his wife.  In the afternoon, the ap-
pellee, accompanied by a young girl friend, drove down
to the office of the appellant.  He was called outside and
got in the back seat of the car and appellee told her
husband that she was going to see Dr. Richards, a psy-
chiatrist at Johns Hopkins Hospital, about her health.
After several visits to Dr. Richards, on September 16,
1940, she went to the Phipps Clinic, where she remained
under treatment until October 14th of that year.  When
she returned to the home of her mother and after being
there for a few days, her friend, Miss Etelka Hoen, ob-
serving that she had no appetite, was morbid, depressed
and thin, invited her to stay with her on her mother's
farm for a month, where she could get plenty of milk,
fresh air and exercise.  During all the time that the
appellee was in the Hopkins Hospital and at the Hoen
home, her husband visited her frequently.  After Octo-
ber 15th he wanted her to come back and live with him
in normal marital relationship, but insisted that the child
remain with the paternal grandparents, where she was
getting excellent care.  He corresponded with her fre-

quently, although she was living near him, but we must note that after October 15, 1940, he kept carbon copies of all the letters he wrote to his wife. The appellee remained at the Hoen home until after Christmas. The appellant and the appellee had Thanksgiving dinner together at a hotel in Baltimore and the husband testifies that at that time, the wife agreed to come back to him, provided he would furnish the necessary servants and provided that they would occupy separate rooms and not resume marital relationship. The husband testified that at Christmas, when he asked his wife what present she would like, she said she preferred curtains for the house at Lutherville. From this remark, at that time apparently, she had no intention of leaving her husband. On January 1, 1941, the wife went to the home at Lutherville and cleaned it up.

Early in January the husband and wife met and he stated that she wanted to take the baby to her mother's house, while she stated that she wanted to take the baby to the home at Lutherville. The husband wanted the baby left with his mother and father, and the wife then said that she would see a lawyer about it. The husband, through his solicitor, on January 15, 1941, then filed a petition in the Circuit Court for Baltimore County in equity alleging that the appellee was not capable of caring for the infant child and that it would be detrimental to the best interest of the infant child to be removed from the home of her paternal grandparents. The petition prayed that the court assume jurisdiction over the infant and the care and custody be awarded to the appellant. The wife, reading in the newspapers about the allegations her husband had made against her, was very indignant. On January 21, 1941, she went to the Lutherville home, accompanied by her stepfather, and with a moving van removed all her effects from that house and carried them to the home of her mother. On February 28, 1941, an answer to the petition for custody was filed by the wife. On April 10th the husband filed a bill for divorce *a mensa et thoro*, which was answered

by the wife on May 19th. After a hearing on the custody petition before Judge William H. Lawrence, a decree was signed by him on July 28, 1941, awarding the custody of the child to the father. The chancellor concluded from the testimony before him that the mental makeup and emotional equipment of Mrs. Mai Pitts at that time was such that, without assistance and supervision, she was not independently capable of properly caring for her daughter. On November 5, 1941, a cross-bill for divorce *a mensa et thoro* was filed by the wife, appellee, which was later amended by leave of court. Various other pleadings were filed, a recital of which is not necessary here. On February 27, 1942, a petition was filed by the appellee asking for consolidation of the custody case previously decided by Judge Lawrence, with the bill for partial divorce on the grounds of desertion filed by the husband, and with the amended cross-bill of complaint filed by the wife for partial divorce and alimony. A demurrer to this petition was filed by the appellant and the case coming before Judge C. Gus Grason, the demurrer was overruled on March 10, 1942, and an appeal taken to this court from that ruling. A demurrer was filed to the amendment of the wife's cross-bill. This was overruled by Judge Grason by an order passed on March 10, 1942, and an appeal taken to this court from that order. The custody case, petition for divorce *a mensa et thoro* on behalf of the husband, and the cross-bill for divorce *a mensa et thoro* on behalf of the wife were ordered consolidated. After subsequent pleadings, the husband was allowed to amend his bill by interlineation, changing the prayer for relief to divorce *a vinculo matrimonii* with the allegation that the separation had continued for the statutory period of eighteen months. The case then proceeded to a hearing.

The filing of the bill for custody by the husband in January, 1941, alleging that she was incapable of caring for her child, highly offended the appellee. There is evidence in the record that in June, 1941, before the decision in the custody case had been filed, she offered

to return to the appellant without any conditions, the child not being a part of the consideration, according to the testimony of her solicitor at that time. The husband did not accede to that request. In December, 1941, a minister from a church in Towson endeavored to effect a reconciliation between the parties, but the husband did not want the reconciliation and gave as his excuse that he did not think that she was sincere in her offers to return, because she would not come back without the child. To expect a mother to voluntarily relinquish the precious possession and custody of her child is hardly a test of the sincerity of her offer to return. The appellant further stated that in January, 1942, he decided that he did not wish a reconciliation because he did not think that his wife was acting in good faith. At that time his wife's health had materially improved. His actions after that date indicate that he had no desire of a reconciliation. On March 4, 1942, the wife wrote the husband a letter, which contained the following: "And since then I have repeatedly offered to return as your wife—remember—both through my attorney and in conversation to you—at Xmas, and the other day, are the last I can remember. * * * You still say I'm not sincere. Isn't the proof of the pudding in the eating?" Her request at Christmas in 1940 for curtains for the house in Lutherville is further evidence of her intention to return to her husband when she recovered her health. Always her excuse for not returning was the condition of her health, which the husband did not seem to appreciate. Her subsequent offers of reconciliation, made through her counsel, through the minister, and by herself in writing, are indications of her good faith. It is true where after a long trial, cohabitation appears impracticable, created by the wife's actions, and there is no sufficient promise of the removal of the cause, the wife cannot urge the husband's rejection of her offers of reconciliation. *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475. The facts in the instant case are not comparable with the case of *Kruse v. Kruse, supra.* If the

wife, in good faith and with a reasonable regard for the comfort, health and welfare of her husband, made an offer to return to him and he refused it, his refusal to accept it amounted to a desertion on his part and the duty then fell upon him of asking a renewal of cohabitation. *Simmont v. Simmont*, 160 Md. 422, 424, 431, 153 A. 665. It was said by this court in the case of *Kirkwood v. Kirkwood*, 165 Md. 547, at pages 551 and 552, 170 A. 180, at page 182: "It is undoubtedly, true that, if one spouse leaves the other without cause, as in the present instance, and repents and proposes to renew the cohabitation, and that other refuses, it constitutes desertion by the one refusing from the time of the refusal, provided the offer to return is made in good faith, and is free from improper qualifications and conditions, and is really intended to be carried out in accordance with the performance of the duties and obligations of the matrimonial cohabitation. *McClees v. McClees*, 162 Md. 70, 74, 75, 158 A. 349; *Simmont v. Simmont*, 160 Md. 422, 432, 153 A. 665; *Wise v. Wise*, 159 Md. 596, 598-600, 152 A. 230." The health of the wife having materially improved and these offers of reconciliation being made so frequently, apparently in good faith, and being rejected by the husband, under the authorities above cited, entitled the appellee to a divorce *a mensa et thoro* and permanent alimony. The chancellor who heard this case had the witnesses before him and the opportunity of observing their demeanor while testifying. His conclusions of fact should not be lightly disturbed by us, he being in a position to observe the witnesses. *Oertel v. Oertel*, 145 Md. 177, 125 A. 545; *Jacobs v. Jacobs*, 170 Md. 405, 185 A. 109; *Bortner v. Leib*, 146 Md. 530, 126 A. 890; *Farmers' Milling & Grain Co. v. Urner*, 151 Md. 43, 134 A. 29; *McClees v. McClees*, *supra*.

As to the appeal from the order of March 10, 1942, consolidating the custody case, the original bill for divorce, and the cross-bill, this question is not properly before us on appeal as no rights of the parties were

finally settled by it and there being no abuse of discretion in the consolidation. *Mitchell v. Smith,* 2 Md. 271. All of these cases contained the same subject matter, affected the rights of the same parties, and are intimately interwoven and were all ruled on by the final decree. Code, 1939, Art. 5, Secs. 30, 31, 32. A satisfactory determination of the divorce case could hardly be made without a determination of the custody of the infant, both being so intimately associated. As was said in 4 *Corpus Juris,* Sec. 2777, page 808: "The action of a trial court in consolidating, or in refusing to consolidate, causes will not be disturbed on appeal in the absence of a manifest abuse of discretion." The rule stated in *Miller, Equity Procedure,* 1897 Ed., Sec. 236, page 294, appears applicable here: "There is no statutory provision in reference to the consolidation of suits in equity; but, applying the maxim 'Equity prevents multiplicity of suits,' cases pending at the same time in the same court in relation to the same subject matter and which can be conveniently determined by one decree, may be consolidated by order passed after due notice. The avoiding of several suits and the consequent expenses, and the convenience of the thing by facilitating progress, are the advantages of consolidation in proper cases. When consolidated, the rights of all parties are as fully before the court as if they had been originally combined in one suit."

In the appeal from the order of March 10, 1942, overruling the demurrer to the amendment of the wife's cross-bill, the appellant contends that the custody awarded the father was *res judicata* by reason of the decree of Judge Lawrence passed on July 28, 1941, and that his action cannot be reviewed by another judge of co-ordinate jurisdiction in the same cause and subject matter. It must be noted, however, that under the decree of Judge Lawrence, the court assumed jurisdiction of the infant child. The testimony, both medical and otherwise, shows that the mental and physical condition of the appellee had materially improved between the time of the passage of the order by Judge Lawrence and the time of the hear-

ing before Judge Grason. Without reciting the voluminous testimony, an instance of this is the following on March 18, 1942, by Dr. Manfred S. Guttmacher, Chief Medical Officer to the Supreme Bench of Baltimore City:

"Q. Now then, Doctor, as a result of your study and of your examination of the patient, will you be good enough to tell us your opinion as to her condition at the present time? A. I consider Mrs. Pitts a normal person."

The custody case was brought under Article 16, Section 85, of the Code of Public General Laws of Maryland, and this section provides in part that the court may from time to time thereafter annul, vary or modify its decree or order in relating to the child. *Alston v. Thomas,* 161 Md. 617, 158 A. 24. It could not convincingly be argued that if the judge who had passed the original order was not available when the circumstances justified it, the decree could not be modified or varied under the wording of the statute. The decree in awarding the custody of the child was not permanent, but temporary in its nature and effect, the court being primarily concerned in having the custody in the person where the best interest of the child would be promoted. *Kartman v. Kartman,* 163 Md. 19, 161 A. 269; *Piotroski v. State,* 179 Md. 377, 18 A. 2d 199; *Barnard v. Godfrey,* 157 Md. 264, 265, 145 A. 614. Custody should not be awarded to a mother merely to gratify her maternal love. *Carter v. Carter,* 156 Md. 500, 144 A. 490. This court said in the case of *Tull v. Tull,* 172 Md. 213, at page 216, 191 A. 572, at page 573, 110 A. L. R. 742, involving a *habeas corpus* case by one party to a marriage for the custody of the infant son and where subsequently the same party filed in the same court on the equity side a bill for divorce and custody: "Courts of equity have jurisdiction over the marital status of the parties, with power to decree divorces, and this very power, when exercised, may be an important factor in determining and awarding the custody of children. There the entire matter of divorce, custody, control,

maintenance, and support, would be in the same jurisdiction and, without multiplicity of suits and unnecessary delays, could be expeditiously disposed of, and the future of the child controlled and directed."

"An order as to the custody of children is not in the nature of a final order but may be changed by the court." *Schouler on Marriage, Divorce, Separation and Domestic Relations*, 6th Ed., Vol. II, Sec. 1893. "Custody should usually be changed only where the interest of the child requires a modification, where it appears advisable for the good of the child." *Schouler, supra,* Sec. 1901. To deprive this infant child of the society, companionship and the instinctive and natural maternal love of her mother, a young woman who, at the time of the passage of the order appealed from, was capable of taking care of and rearing the infant in a home where it would be provided with all the necessities of life, would hardly be to the interests of that child. The mother-in-law, Mrs. Pitts, spoke of the appellee, when in good health, as the loveliest, the quietest and the gentlest girl she ever knew, that she was perfectly lovely always. At the home of Mr. and Mrs. Tilghman G. Pitts, Sr., the infant received adequate care and attention by a nurse. However, the association of the child with its young mother in suitable surroundings is of primary importance in the case now before us.

In reference to the review of the rulings of the chancellor in refusing to permit questions touching the sincerity of the wife's offer of reconciliation, it appears that this matter was thoroughly investigated and with no prejudice to the rights of the appellant. As to the refusal to permit questions to elicit the animus of the stepfather and the mother of the appellee, it is apparent throughout the record that the stepfather was very indifferent to the appellant and the mother-in-law, Mrs. Griffith, was prejudiced against him. Mrs. Griffith strenuously objected to the marriage of the appellant and the appellee. As a result of this hostility, the appellant never visited the home of his wife after the mar-

riage although requested by her mother to come in the house while waiting for his wife in a car outside. These matters have all been taken into consideration in the decision of this case. As to the refusal of the chancellor to admit in evidence all of the proceedings in the custody case, both records are before us and as the cases were consolidated, the evidence in all the cases has been considered in these appeals and therefore there has been no prejudice to the appellant.

The appeals from the orders of March 10, 1942, consolidating the cases and overruling the demurrer, are interlocutory in their nature in that the decree finally determined these matters, and therefore the appeals from those orders should be dismissed. *Mitchell v. Smith, supra;* Code, 1939, Art. 5, Secs. 30 and 31. The final decree of March 23, 1942, in numbers 21, 22 and 23 should be affirmed.

> *Appeal from the order of March 10, 1942, consolidating the three cases, dismissed, costs to be paid by the appellant.*

> *Appeal from the order of March 10, 1942, overruling the demurrer to the cross-bill, dismissed, costs to be paid by the appellant.*

> *Final decree of March 23, 1942, affirmed, costs to be paid by the appellant.*